UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

RAYMOND CROCHET                                                    CIVIL ACTION

VERSUS                                                             16-36-SDD-EWD

BRISTOL-MYERS SQUIBB,
AND OTSUKA AMERICA
PHARMACEUTICAL, INC.

**RULING**

This matter is before the Court on the *Motion to Dismiss*[1] by Defendants, Bristol-Myers Squibb Company and Otsuka America Pharmaceutical, Inc. ("Defendants"). Plaintiff, Raymond Crochet, ("Plaintiff") has filed an *Opposition*[2] to this motion to which Defendants have filed a *Reply*.[3] For the following reasons, the Court finds that the Defendants' motion should be granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

Plaintiff brings this lawsuit after contracting Tardive Dyskinesia ("TD") allegedly as a result of taking the prescription drug Abilify.  TD is a neurological disorder resulting in involuntary, repetitive body movements.  In late 2014, Plaintiff claims he developed uncontrollable movements of his mouth and jaw, including lip smacking and jaw clenching.[4]   Plaintiff contends TD has no cure and is irreversible.[5]   Plaintiff seeks

---

[1] Rec. Doc. No. 6.
[2] Rec. Doc. No. 20.
[3] Rec. Doc. No. 21.
[4] Rec. Doc. No. 1-2, ¶¶ VIII & IX.
[5] Rec. Doc. No. 20, p. 1, citing Taber's Cyclopedic Medical Dictionary at 624 (19th ed. 2001).
32925

rescission of his purchase, asserts claims under the Louisiana Products Liability Act ("LPLA"),[6] and asserts a redhibition claim under Louisiana law.  The Defendants have moved to dismiss Plaintiff's design defect claim and redhibition claim.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Because subject matter jurisdiction in this case is based on diversity of citizenship, the substantive law of Louisiana governs this dispute.[7]

## II.     LAW AND ANALYSIS

### A. Motion to Dismiss Under Rule 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[8]  The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[9]  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[10]  In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation

---

[6] La. R.S. 9:2800.51, *et seq.*
[7] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).
[8] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)(quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).
[9] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).
[10] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d at 467).

32925

of the elements of a cause of action will not do."[11]  A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[12]  However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[13]  In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[14]  "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[15]  On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[16]

### B. The LPLA – Design Defect Claim

The LPLA establishes the exclusive theory of liability for manufacturers regarding damages caused by their products.  The applicable standard under the LPLA is as follows: "The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity."[17]  Thus, to maintain a successful claim under the LPLA, a claimant must establish four elements:  (1) that the defendant is a

---

[11] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(internal citations and brackets omitted)(hereinafter *Twombly*).
[12] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(internal citations omitted)(hereinafter "*Iqbal*").
[13] *Twombly*, 550 U.S. at 570.
[14] *Iqbal*, 556 U.S. at 678.
[15] *Taha v. William Marsh Rice University*, 2012 WL 1576099 at *2 (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).
[16] *Twombly*, 550 U.S. at 556 (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).
[17] La. R.S. 9:2800.54(A).
32925

manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous;" and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.[18]

A product is "unreasonably dangerous" under the LPLA in one of four ways: (1) construction or composition; (2) design; (3) inadequate warning; or (4) failure to conform to an express warranty.[19] The "unreasonably dangerous" characteristic must exist at the time the product left the manufacturer's control or result from a reasonably anticipated modification or alteration of the product.[20] Louisiana law does not permit a factfinder "to presume an unreasonably dangerous condition solely from the fact that injury occurred."[21] Rather, the claimant has the burden of proving the required elements under the LPLA.[22]

Under Section 9:2800.56 of the LPLA, a product is unreasonably dangerous in its design if, when the product left the manufacturer's control: (1) there existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

---

[18] *Ayo v. Triplex, Inc.*, 457 F. App'x 382, 385-86 (5th Cir. 2012)(citing *Jack v. Alberto–Culver USA, Inc.*, 949 So.2d 1256, 1258 (La. 2007) (citing La. R.S. 9:2800.54(A)).
[19] La. R.S. § 9:2800.54(B).
[20] *Id.* § 2800.54(C).
[21] *Woodling v. Hubbell Inc.*, 35 F. App'x 386, *4 (5th Cir. 2002)(citing *Krummel v. Bombardier Corp.*, 206 F.3d 548, 551 (5th Cir. 2000) (quoting *McCarthy v. Danek Med., Inc.*, 65 F.Supp.2d 410, 412 (E.D.La.1999)).
[22] La. R.S. 9:2800.54(D).
32925

This test requires a plaintiff to prove both "that an alternative design existed" at the time the product was manufactured and "that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility)."[23]

Plaintiff alleges that the Defendants "failed to consider an alternative 'design' of said medication that would not cause Tardive Dyskinesia"; and "failed to consider the design of other available drugs that could treat Mr. Crochet's condition that did not have, or had a much lower incidence and risk of developing Tardive Dyskinesia following treatment[.]"[24] Defendants contend these allegations fail to state a claim because Plaintiff does not allege that any safer alternative exists or what that design is, and fails to allege how Abilify's design is defective, *i.e.*, what aspect of Abilify's design caused his TD. Defendants contend Plaintiff has only pled the legal elements of a design claim in conclusory fashion.  Defendants rely on the recent decision of the Eastern District of Louisiana court in *Jenkins v. Bristol-Myers Squibb*,[25] brought by the same plaintiff's counsel and making the same allegations regarding Abilify.  In *Jenkins*, the court held that the allegations that Bristol-Myers "failed to consider an alternative design" of the medication was insufficient because "Plaintiff fails to plead that an alternative design existed that could have prevented Plaintiff's injuries.  It is not sufficient under the LPLA to allege that Defendants failed to *consider* an alternative design."[26]  Defendants also rely

---

[23] *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 700-01 (5th Cir. 2012) (citing *Lawrence v. Gen. Motors Corp.*, 73 F.3d 587, 590 (5th Cir. 1996)).
[24] Rec. Doc. No. 1-2, ¶ XXV(B)(2)&(3).
[25] No. 14-2499, 2015 WL 5012130 (E.D. La. Aug. 21, 2015).
[26] *Id.* at *4 (emphasis in original).
32925

on *Watson v. Bayer Healthcare Pharmaceuticals, Inc.*,[27] wherein a defective design claim was made regarding an intrauterine device. The plaintiff alleged that "[t]here are contraceptives on the market with safer alternative designs."[28] The court granted the motion to dismiss, finding that the plaintiff

> has failed to allege how Mirena®'s design is defective, what aspect of Mirena®'s design caused her injuries, or how the defective design relates to her specific injuries. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration in original) (citation omitted).[29]

The *Watson* court did, however, allow the plaintiff fourteen days to seek leave to amend her complaint to cure the defects of her LPLA claim.[30]

In opposition to this motion, Plaintiff relies heavily on *Lahaye v. Astrazeneca Pharmaceuticals*,[31] a LPLA case brought regarding the prescription drug Nexium. In *Lahaye*, the plaintiffs alleged that:

> [T]he nature of the alleged defect is that longterm consumption of Nexium increases the risk of contracting clostridium difficile ("C.diff."), which may cause "septic shock and toxic megacolon," necessitating a colectomy. (Doc. 23 at ¶¶ 5, 11, 12). On just these facts, it appears as though Plaintiffs have at least implicitly pled an alternative design—a medication that would not cause C. diff. or lead the party who ingested Nexium to require a colectomy. *See, e.g., Winslow v. W.L. Gore & Assoc. Inc.*, No. CIV. A. 10–116, 2010 WL 866184, at *2 (W.D.La. Jan. 21, 2011), *report and recommendation adopted as modified sub nom.*, *Winslow v. W.L. Gore & Associates, Inc.*, No. CIV. A. 10–00116, 2011 WL 873562 (W.D.La. Mar. 11, 2011) (denying a motion to dismiss where "plaintiff implicitly pled alternative design"); *Corley v. Stryker Orthopaedics*, No. 13–2571, 2014 WL 3125990, at *1–2 (W.D.La. July 3, 2014) (concluding that the plaintiff had inferentially made sufficient allegation, and observing that at the motion dismiss stage, "the

---

[27] No. 13-212, 2013 WL 1558328 (E.D. La. Apr. 11, 2013).
[28] *Id.* at *5.
[29] *Id.*
[30] *Id.*
[31] No. 14-00111, 2015 WL 1935947 (M.D. La. Apr. 28, 2015).

32925

plaintiff need not prove her claim in her complaint; she need only sufficiently allege her claim at this stage of the litigation,").[32]

The *Lahaye* court denied the motion to dismiss and noted that "much of the evidence in pharmaceutical products liability cases may be in the defendant's possession, and thus, without the benefit of discovery, stating more specific allegations may be nearly impossible at this stage."[33]

The Court has considered the arguments of the parties and the jurisprudence cited above. The Court finds that Plaintiff's allegation that Defendants "failed to consider the design of other available drugs that could treat Mr. Crochet's condition that did not have, or had a much lower incidence and risk of developing Tardive Dyskinesia following treatment"[34] is sufficient to state a design defect under the LPLA. This allegation goes further than the allegations in *Jenkins* – where it was alleged that the defendant failed to consider an alternative design that did not cause TD - in that Plaintiff herein does claim that alternative medications exist that treat his condition but do not cause TD. The *Jenkins* court stated: "Plaintiff must nevertheless allege that an alternative design existed that would not have caused Plaintiff's injuries."[35] The Court finds that Plaintiff has made this allegation. The *Motion to Dismiss* the design defect claim is DENIED.

### C. Redhibition

Under Louisiana law, a buyer has a warranty "against redhibitory defects, or vices, in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so

---

[32] *Id.* at *4.
[33] *Id.* at *5 (*see Winslow v. W.L. Gore & Assoc., Inc.*, No. 10-116, 2010 WL 866184, at *2 (W.D. La. Jan. 21, 2011) *report and recommendation adopted as modified sub nom. Winslow v. W.L. Gore & Associates, Inc.*, No. 10–116, 2011 WL 873562 (W.D.La. Mar. 11, 2011).
[34] Rec. Doc. No. 1-2, ¶ XXV(B)(2)&(3).
[35] *Jenkins*, at *4.
32925

inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."[36] Such a defect may give a buyer the right to obtain rescission of the sale, or, if the buyer would have still bought the product but for a lesser price, a reduction of the purchase price.[37] If a seller is deemed to be in "bad faith," a buyer can also recover damages and attorneys' fees.[38] The Louisiana Civil Code makes clear that recovery under a theory of redhibition is limited to purely economic loss and not recovery for personal injury.[39]

A defect is not hidden, and therefore not redhibitory, when the buyer knows of it either because it was disclosed by the seller or because the buyer discovered it himself.[40] The standard of diligence that must be exercised by the buyer in determining whether the thing purchased is defective is that of a prudent administrator.[41] The buyer must make more than a casual observation of the object; he must examine the thing to ascertain its soundness.[42] Testimonial proof concerning the seller's declaration of defects to the buyer, or of the buyer's knowledge of the defects, may be received. The seller need not respond for defects in the thing of which the buyer was aware, irrespective of the gravity of the defects.[43]

Defendants have also moved to dismiss Plaintiff's redhibition claim. Defendants contend Plaintiff has failed to allege a specific defect in Abilify. To the extent it can be

---

[36] La. Civ.Code Ann. art. 2520.
[37] *Id.*
[38] La. Civ.Code Ann. art. 2545.
[39] *Alexander v. GlaxoSmithKline, LLC*, 2015 WL 5440994 at *5 (E.D. La. Sept. 14, 2015)(citing *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir.1997).
[40] La. C.C. art. 2521, Official Revision Comment (b).
[41] La. C.C. art. 2521, Official Revision Comment (c).
[42] La. C.C. art. 2521, Official Revision Comment (d).
[43] La. C.C. art. 2521, Official Revision Comments (e) and (f).
32925

assumed that the defect alleged is that Abilify can cause TD, Defendants argue this alleged defect is apparent and obvious because of the extensive warning labels which accompany the Abilify medication and, in fact, do warn of the possibility that TD may develop from taking Abilify.[44]  The Defendants assert that federal courts routinely dismiss redhibition claims where a consumer has ample warning of the nature of the product prior to purchase.[45]

Plaintiff opposes this motion, arguing that he has stated a claim of redhibition because he alleges that the provided warning was insufficient to advise Plaintiff and his treating physician of the actual risk of developing TD.  Moreover, Plaintiff contends the defect in Abilify is latent, not possible of being discovered by simple inspection, which requires a factual investigation not appropriate for a motion to dismiss.  Plaintiff argues that he could not have been expected to know the actual risk of TD by inspecting a label that he alleges did not accurately report the actual risk.

Defendants counter that, in arguing the adequacy of the given warning, Plaintiff is confusing his redhibition claim with his failure to warn claim.  Defendants note comment (f) to La. Civ. Code art. 2521, which states:  "[T]he seller need not respond for defects in the thing of which the buyer was aware, irrespective of the gravity of the defects."

The Court finds that Plaintiff fails to state a claim for redhibition.  Plaintiff has argued in his brief, but has not alleged anywhere in his *Petition*, that the alleged defect in Abilify was latent such that his redhibition claim should stand.  A latent defect is one that "is hidden or concealed from knowledge as well as from sight and which a reasonable

---

[44] Rec. Doc. No. 6-1, p. 9, citing Rec. Doc. No. 6-2, p. 16.
[45] *Id.*, citing *Johnson v. CHL Enterprises*, 115 F.Supp.2d 729 (W.D. La. 2000).
32925

customary inspection would not reveal."[46]  The Court finds that the risk of developing TD with the use of Abilify was readily apparent by reading the attached warning label.  While the Plaintiff maintains that the Defendants failed to disclose the "actual risk of developing [TD],"[47] or the "frequency and importance of specific monitoring tests to detect [TD],"[48] it is clear from reading the warning label that Plaintiff was advised that taking Abilify could cause TD.  The warning label reads as follows:[49]

### 5.4 Tardive Dyskinesia

A syndrome of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with antipsychotic drugs. Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to rely upon prevalence estimates to predict, at the inception of antipsychotic treatment, which patients are likely to develop the syndrome. Whether antipsychotic drug products differ in their potential to cause tardive dyskinesia is unknown.

The risk of developing tardive dyskinesia and the likelihood that it will become irreversible are believed to increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to the patient increase. However, the syndrome can develop, although much less commonly, after relatively brief treatment periods at low doses.

There is no known treatment for established cases of tardive dyskinesia, although the syndrome may remit, partially or completely, if antipsychotic treatment is withdrawn. Antipsychotic treatment, itself, however, may suppress (or partially suppress) the signs and symptoms of the syndrome and, thereby, may possibly mask the underlying process. The effect that symptomatic suppression has upon the long-term course of the syndrome is unknown.

Given these considerations, ABILIFY should be prescribed in a manner that is most likely to minimize the occurrence of tardive dyskinesia. Chronic antipsychotic treatment should generally be reserved for patients who suffer from a chronic illness that (1) is known to respond to antipsychotic drugs and (2) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate. In patients who do require chronic treatment, the smallest

---

[46] *In re Chinese Manufactured Drywall Products Liability Litigation*, 759 F.Supp.2d 822, 835 (E.D. La. 2010)(quoting *Nida v. State Farm Fire & Cas. Co.*, 454 So.2d 328, 335 (La. App. 3 Cir. 1984)(internal quotation marks omitted)).
[47] Rec. Doc. No. 20, p. 9.
[48] *Id.* at p. 10.
[49] The Court makes no comment and has no opinion regarding the sufficiency or adequacy of this warning for purposes of Plaintiff's LPLA claims.
32925

> dose and the shortest duration of treatment producing a satisfactory clinical response should be sought. The need for continued treatment should be reassessed periodically.
>
> If signs and symptoms of tardive dyskinesia appear in a patient on ABILIFY, drug discontinuation should be considered. However, some patients may require treatment with ABILIFY despite the presence of the syndrome. [50]

Based on this warning, the Court cannot find that Plaintiff has stated a claim for redhibition. Plaintiff was clearly notified of the defect in Abilify which had the potential to cause TD, and the warning likewise explained TD and its symptoms. Plaintiff's arguments regarding the sufficiency and/or adequacy of this warning are more appropriate on his failure to warn claim under the LPLA which remains before the Court. The comments on the redhibition code articles make clear that the gravity of the defect present is not the issue on a redhibition claim, simply whether the buyer was warned of the defect. Considering the warning label above, Plaintiff was aware, upon reasonable inspection of the warning label, that the nature of the product could potentially cause TD. Thus, Plaintiff's redhibition claim will be dismissed.[51]

---

[50] Rec. Doc. No. 6-2, pp. 16-17.
[51] Because the Court believes amendment on this issue would be futile, Plaintiff's alternative motion for leave to amend is DENIED.

32925

## III. CONCLUSION

For the reasons set forth above, the *Motion to Dismiss*[52] by Defendants, Bristol-Myers Squibb Company and Otsuka America Pharmaceutical, Inc., is GRANTED in part and DENIED in part.  Plaintiff's redhibition claim is dismissed with prejudice.  Plaintiff's design defect under the LPLA remains before the Court.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on June 28, 2016.

*Shelly D. Dick*

**JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[52] Rec. Doc. No. 6.
32925