**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| RAYMOND CROCHET | CIVIL ACTION |
| VERSUS | |
| BRISTOL-MYERS SQUIBB COMPANY and OTSUKA AMERICA PHARMACEUTICAL INC. | 16-36-SDD-EWD |

**RULING**

This matter is before the Court on the *Motion for Summary Judgment*[1] by Defendants, Bristol-Myers Squibb Company and Otsuka America Pharmaceutical, Inc. (collectively "Defendants"). Plaintiff, Raymond Crochet ("Crochet or Plaintiff") has filed an *Opposition*[2] to this motion, to which Defendants filed a *Reply*.[3] For the reasons which follow, the Court finds that the Defendants' *Motion* should be GRANTED.

**I.    FACTUAL BACKGROUND**

Crochet filed this lawsuit after contracting Tardive Dyskinesia ("TD") allegedly as a result of taking the prescription drug Abilify. Abilify is an atypical antipsychotic approved for treatment of serious mental health conditions.[4] TD is a medication-induced movement disorder that falls under the umbrella of extrapyramidal side effects/syndromes.[5] TD is a known and obvious risk of Abilify.[6]

---

[1] Rec. Doc. 35.
[2] Rec. Doc. 57.
[3] Rec. Doc. 62.
[4] Rec. Doc. 35-1, p. 3; Rec. Doc. 35-9.
[5] Rec. Doc. 35-1, p. 5; Rec. Doc. 35-5, pp. 8-10.
[6] Rec. Doc. 35-1, p. 3; Rec. Doc. 35-2, p. 14; Rec. Doc. 35-9, pp. 17-18.
45387

Crochet was first prescribed Abilify in August of 2012 by Dr. Padmini Nagaraj.[7] Dr. Nagaraj prescribed the Abilify as an adjunct to therapy to treat Crochet's depression after being admitted to Greenbriar Hospital for a psychiatric stay in July of 2012.[8] Thereafter, Dr. Clinton Sharp ("Dr. Sharp"), Crochet's primary care physician, continued to refill the Abilify prescription.[9]

On July 28, 2014, Dr. Sharp noticed that Crochet had developed a "shuffling gait" and Parkinsons-like symptoms.[10] At that point, Dr. Sharp referred Crochet to Dr. James Houser ("Dr. Houser"), a neurologist, because he was concerned that Crochet might be having Parkinsonism,[11] which, like TD, is a type of extrapyramidal side effects/syndromes ("EPS").[12] Dr. Sharp explained to Crochet that the Parkinsons-like symptoms may be a side effect of Abilify and wanted Dr. Houser to "confirm this."[13]

On August 1, 2014, Dr. Houser instructed Crochet to avoid neuroleptics and to decrease his Abilify to 10 mg daily until he saw a psychiatrist about weaning off the drug.[14] Crochet testified that he understood at that time that the shuffling gait may have had something to do with Abilify, and Dr. Houser was concerned that Abilify may be responsible for that.[15] Shortly after stopping the Abilify, Crochet's shuffling gait went

---

[7] Rec. Doc. 35-10, p. 30.
[8] Rec. Doc. 35-1, p. 4; Rec. Doc. 35-3, p. 63-64.
[9] Rec. Doc. 35-1, p. 4; Rec. Doc. 35-4, pp. 56-60.
[10] Rec. Doc. 35-11, p. 4.
[11] The national Parkinson Foundation defines Parkinsonism to be a general term for neurological disorders akin to Parkinson's disease, "such as tremors, slow movement and stiffness. Under the category of Parkinsonism there are a number of disorders, some of which have yet to be clearly defined or named." National Parkinson Foundation, *Parkinson's Disease v. Parkinsonism (2018)*, <http://www.parkinson.org/sites/default/files/Parkinsonism.pdf>; Rec. Doc. 57, p. 2, fn. 1.
[12] Rec. Doc. 35-1, p. 6; Rec. Doc. 35-11, p. 4.
[13] Rec. Doc. 35-4, pp. 82-84.
[14] Rec. Doc. 35-1, p. 6; Rec. Doc. 35-12, p. 4.
[15] *Id*; Rec. Doc. 35-3, pp. 57-58, 96-98.

45387

away.¹⁶ Soon thereafter, Crochet began experiencing involuntary mouth and tongue movements. Crochet testified that the tongue movements began sometime between his first and second visit with Dr. Houser and that Crochet thought that stopping the Abilify might have caused the problem.¹⁷

On September 18, 2014, Crochet visited LifeNet Psychiatry where he was under the care of Scott St. Amant ("St. Amant"), a family psychiatric mental health nurse practitioner.¹⁸ On that date, St. Amant first noted that Crochet presented with obvious lip-smacking and involuntary tongue movements.¹⁹ St. Amant instructed Corchet to follow up with a neurologist due to the orofacial movements he observed.²⁰

On October 3, 2014, Crochet again visited LifeNet Psychiatry. St. Amant again noted that Crochet presented with lip smacking and with an attenuated shuffling gait.²¹ St. Amant noted that the symptoms had been ongoing for at least two weeks and again referred Crochet to see a neurologist.²² St. Amant testified that he was concerned about the orofacial movements because he thought it was consistent with TD.²³ On October 7, 2014, Crcochet saw Dr. Houser for the second time. At this visit, Dr. Houser observed the mouth movements and diagnosed Crochet with TD.²⁴

Crochet filed the current suit on October 7, 2015, alleging Defendants violated Louisiana's Products Liability Act ("LPLA").²⁵ Specifically, Crochet alleges that

---

¹⁶ Rec. Doc. 35-3, pp. 98-100.
¹⁷ Rec. Doc. 35-3, pp. 98-99, 117-118.
¹⁸ Rec. Doc. 35-1, p. 7; Rec. Doc. 35-8, pp. 7, 46-47, 51, 62.
¹⁹ Rec. Doc. 35-8, pp. 53-65; Rec. Doc. 35-13.
²⁰ *Id.*
²¹ Rec. Doc. 35-8, pp. 74-75; Rec. Doc. 35-1, p. 7.
²² Rec. Doc. 35-8, p. 80.
²³ Rec. Doc. 35-8, pp. 80-82.
²⁴ Rec. Doc. 35-5, pp. 26-27.
²⁵ La. R.S. 9:2800.51, *et seq.*
45387

Defendants failed to properly warn of the onset of TD and that Abilify is unreasonably dangerous in design.[26] Defendants now move for summary judgment on all claims asserted by Crochet because: (1) his suit was filed more than a year after he had notice of his claims, (2) he cannot show that a deficiency in the Abilify warning caused his injuries, and (3) he has not proffered any expert testimony on design defect as required by Louisiana law.[27] Crochet opposes the *Motion for Summary Judgment* arguing that: (1) his suit was filed within one year of discovering he had developed TD, (2) the learned-intermediary doctrine does not bar his inadequate warning claim, and (3) the availability of alternative medications that do not carry a risk of TD demonstrate that Defendants are not entitled to summary judgment.[28]

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[30] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[31] If the moving party satisfies its burden, "the non-moving party must show that

---

[26] Rec. Doc. 1-2, pp. 5-6.
[27] Rec. Doc. 35-1, p. 1.
[28] Rec. Doc. 57, p. 1.
[29] Fed. R. Civ. P. 56(a).
[30] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[31] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, (1986)).
45387

summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[32] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[33]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[34] All reasonable factual inferences are drawn in favor of the nonmoving party.[35] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[36] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[37]

As is the case here, "[w]here the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case. The nonmovant must then come forward with

---

[32] *Rivera v. Houston Indep. School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[33] *Willis v. Roche Biomedical Labs, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).
[34] *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).
[35] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[36] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[37] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
45387

specific facts showing that there is a genuine [dispute] for trial."[38]

## B. Prescriptive Period in Pharmaceutical Product Liability Cases

Under the Louisiana Civil Code, a plaintiff has one year from the day injury or damage is sustained in order to file a claim.[39] However, Louisiana courts apply the doctrine of *contra non valentem*, which ensures that the one year prescriptive period does not begin to run until the plaintiff has actual or constructive knowledge of (1) the tortious act, (2) the damage, and (3) the causal relationship between the act and the damage.[40] "Courts have summarized the *contra non valentem* doctrine as an inquiry into the 'reasonableness' of the victim's behavior in light of his perceived injuries.[41] In other words, "[p]rescription does not run as long as it was reasonable for the victim not to recognize that the [injury] may be related to the [tort]."[42]

In the context of pharmaceutical cases, "[t]he commencement of prescription does not… wait for the pronouncement of a victim's physician or of an expert."[43] Additionally, "[i]t is not necessary for the plaintiff to have experienced all of the symptoms, injuries or damages ... for prescription to begin to run.[44] Ultimately, [i]t is the plaintiff/patient's knowledge of the connection between his/her alleged injuries and damages and the

---

[38] *Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 310-11 (5th Cir. 2017)(citation and quotation marks omitted).
[39] La. Civ. Code art. 3492.
[40] *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1139 (5th Cir. 1987).
[41] *Jenkins v. Bristol-Myers Squibb*, No. CV 14-2499, 2016 WL 10100281, at *6 (E.D. La. July 8, 2016), *aff'd sub nom. Jenkins v. Bristol-Myers Squibb Co.*, 689 F. App'x 793 (5th Cir. 2017).
[42] *Jenkins*, 689 F. App'x at 796 (5th Cir. 2017)(quoting *Griffin v. Kinberger*, 507 So.2d 821, 823-24 (La. 1987)).
[43] *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999); *See also Guidry v. Aventis Pharm., Inc.*, 418 F. Supp. 2d 835 (M.D. La. 2006).
[44] *Peterson v. C.R. Bard, Inc.*, No. CV 13-0528, 2015 WL 2239681, at *2 (M.D. La. May 12, 2015), *aff'd*, 654 F. App'x 667 (5th Cir. 2016).

45387

medical product that is key to the accrual of the cause of action."[45]

In this case, Crochet argues that prescription began to run on October 7, 2014, and he filed suit exactly one year later. Specifically, Crochet argues that it was only on October 7, 2014 that Dr. Houser told him that **stopping** Abilify could cause TD to develop, and even then, Crochet believed that his condition to be transitory.[46] Crochet further argues that a valid argument could be made that prescription did not begin to run until later when Dr. Houser told Crochet his condition was permanent.[47] Crochet's argument centers on the position that he did not become aware of the connection between Abilify and TD until the October 7th visit with Dr. Houser.[48] Crochet argues simply that, "no doctor told him his facial condition was tardive dyskinesia, was permanent, or that it was caused by taking Abilify (as opposed to Crochet's mistaken belief that stopping Abilify might have something to do with his issues)."[49]

Defendants contend the undisputed facts show that, by August 1, 2014, Crochet's symptoms had manifested, and he was aware of the connection between those symptoms and Abilify. In other words, Defendants argue that once Dr. Houser told Crochet to decrease the Abilify in order to address the shuffling gait, Crochet was aware of the connection between the involuntary movements and Abilify. Defendants also argue that Crochet's own testimony that he knew his lip smacking, which developed sometime in September, was due to the Abilify, further demonstrates that Crochet was aware of the connection between his symptoms and Abilify at that time.

---

[45] *Id.*
[46] Red. Doc. 57, p. 8 (Emphasis in original).
[47] *Id.* at p. 9.
[48] *Id.* at p. 10.
[49] *Id.* at p. 11.
45387

Both parties cite to and discuss the Fifth Circuit case of *Jenkins v. Bristol-Myers Squibb*,[50] which the Court finds instructive on the foregoing issue. In *Jenkins*, the Fifth Circuit affirmed a district court's decision in granting summary judgment in favor of the defendants based on prescription.[51] The plaintiff brought claims under the LPLA after developing TD from taking Abilify.[52] The court found that prescription began to run in April of 2013 when the plaintiff sustained tremors, fidgeting, and jaw clenching. The Court rejected the plaintiff's argument that there existed a serious factual dispute if he had even developed TD at that time.[53] In reaching this conclusion, the court relied on Jenkins' own testimony that he understood in April of 2013 that his doctor took him off Abilify because of the twitching movements.[54]

The Court finds that the reasoning and analysis in *Jenkins* are applicable in this case as the facts are so similar. The record reflects that Crochet first became aware that Abilify was connected to his shuffling gate on July 28, 2014 when Dr. Sharp referred him to Dr. Houser because he was concerned that the movement was connected to Abilify. This connection was further solidified on August 1, 2014 when Dr. Houser told Crochet to begin weaning off of Abilify in order to address the movement issues. While Crochet testified that, after stopping the Abilify, his symptoms went away, another movement disorder (the lip smacking and involuntary tongue movement) was observed by St. Amant on September 28, 2014. At that time, St. Amant advised Crochet to consult a neurologist about the orofacial movements because he was concerned that it was TD. On October 3,

---

[50] 689 F. App'x 793 (5th Cir. 2017).
[51] *Id.*
[52] *Id.* at 795.
[53] *Id.*
[54] *Id.* at 797.

45387

2014, St. Amant noted that Crochet presented with attenuated shuffling gait and that the involuntary mouth movements had persisted for two weeks. Again, St. Amant advised Cochet to consult a neurologist for these symptoms. Finally, Crochet's own testimony reflects that he was aware, prior to the second visit with Dr. Houser on October 7, 2014, that the symptoms he was experiencing were being caused by the Abilify.

Corchet's argument that no doctor told him that his facial condition was due to TD, was permanent, or that it was caused by Abilify, is of no moment. The law is clear that the crucial date for the prescriptive period is the date of injury and not the date of diagnosis. As the Fifth Circuit expressed in *Jenkins*, prescription began to run when Crochet's symptoms (shuffling gait, lip smacking, and involuntary mouth movements) manifested, and he was aware of the connection to Abilify. The undisputed facts establish that prior to October 7, 2014, Crochet exhibited cognizable injuries that could support a cause of action, and he was aware of their connection to Abilify. Therefore, the Court finds that Crochet's claims are time-barred under Louisiana law because Crochet's injury occurred in September of 2014, and prescribed in September 2015. Plaintiff's claims filed on October 7, 2015 have prescribed as a matter of law. Plaintiff has come forward with no evidence to demonstrate a material issue of fact as to prescription. Thus, summary judgment is appropriate in favor of Defendants.[55]

---

[55] As the Court finds that Plaintiff's claims have prescribed as a matter of law, the remaining arguments in Defendants' *Motion* are not reached.

45387

## III. CONCLUSION

For the reasons set forth above, Defendants' *Motion for Summary Judgment*[56] is GRANTED. Plaintiff's claims against Defendants Bristol-Myers Squibb Company and Otsuka America Pharmaceutical, Inc. are DISMISSED with prejudice.

Judgment shall be entered accordingly.

Therefore, the final pretrial conference set for April 24, 2018, at 2:30 p.m. is canceled.

The bench trial set for May 7, 2018, is cancelled.

All pending motions are denied as moot.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>April 24, 2018</u>.

*Shelly D. Dick*

**JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[56] Rec. Doc. 35.